Lucretia Etta Coxwell Stinson died a resident of Mobile County on September 19, 1986. On October 14, 1986, appellant Walter L. Coleman petitioned the Probate Court of Mobile County for letters of administration on the estate of Ms. Stinson, claiming to be her surviving spouse by common-law marriage. On October 22, 1986, appellee Sondra Maniatis Aubert, the daughter of the deceased, filed her mother's will for probate and was issued letters testamentary on the estate. Coleman was not named as a beneficiary in the will. Thereafter, on November 18, 1986, he filed a "Petition for Determination of Heirship" in the probate court, seeking to establish his rights in the deceased's estate as her surviving spouse. The case was subsequently removed to circuit court at the request of the executrix, who thereafter filed a motion for summary judgment supported by her affidavit and by Coleman's deposition testimony. Coleman submitted his affidavit, as well as the affidavits of John Morgan, Larry Hutter, and Pearl Frost, in opposition to the motion. The *Page 882 
trial court granted summary judgment for the executrix; hence, this appeal.
The sole issue presented for our review is whether the trial court erred when it granted the executrix's motion for summary judgment. If Coleman is not the common-law husband of the deceased as a matter of law, it did not. If a question of fact exists as to whether he is the common-law husband of the deceased, it did. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56 (c), Ala.R.Civ.P. The burden is on the moving party, the executrix, to clearly show that there is no genuine issue of material fact. All reasonable doubts concerning the existence of a genuine issue of fact must be resolved against her. The burden is further increased by the scintilla ("any evidence") rule, which requires that a summary judgment not be granted if there is any evidence supporting the position of the nonmovant. Silk v. Merrill Lynch, Pierce,Fenner Smith, 437 So.2d 112 (Ala. 1983).
The elements of a valid common-law marriage in Alabama are: (1) capacity; (2) present agreement or consent to be husband and wife; (3) public recognition of the existence of the marriage; and (4) cohabitation or mutual assumption openly of marital duties and obligations. Aaberg v. Aaberg,512 So.2d 1375 (Ala. 1987). No ceremony or particular words are necessary. Etheridge v. Yeager, 465 So.2d 378 (Ala. 1985).
Coleman testified in his deposition, in pertinent part, as follows:
 "Q. All right. Do you claim any interest in this lady's estate?
"A. Yes, I do.
 "Q. Under what circumstances — under what basis do you claim an interest?
 "A. Well, just being married — living with her a certain length of time. And going to be married.
"Q. And going to be married?
"A. Uh-huh.
"Q. When were you going to be married?
 "A. Well she asked me if I wanted to get married and I said yes, I do.
 "Q. All right, sir. When were you all going to get married?
"A. About six weeks before she died.
 "Q. What steps if any had been taken in order to bring about a marriage?
"A. We had taken our blood test.
"Q. Where was that taken?
 "A. Hers was taken by Doctor Clarkson and mine was taken by my — by Doctor Leon McVay.
 "Q. All right, sir. About six weeks before she died?
 "A. Well, we had talked about it previously. What had happened was her sisters came over and had spent some time with her. Of course we had been going together for a number of years, and they felt that — she said they thought we should get married. So, she asked me if I would like to get married and I said, I sure would.
"Q. What interrupted the plans to get married?
 "A. I really don't know what it was. It was a combination of, I guess, waiting too long. Her getting sick. That was about it."
Coleman also testified in his deposition that he could produce no documents on which the deceased had used the name Coleman. He also acknowledged that he had filed his income tax returns for the years 1985 and 1986 as a single person; that the utility services at the deceased's home were in her name only[1]; and that the home of the deceased was assessed in her name for property tax purposes.
The executrix's affidavit reads as follows:
 "I am the daughter, of Lucretia Etta Coxwell Stinson, deceased, and she departed this life on September 19, 1986, a single person and she never professed to be the wife of or married to Walter L. Coleman. My mother was always acknowledged by verbal and documentary *Page 883 
evidence that she was a single person, her income tax returns were filed as a single person, and she never used the name of Coleman in any social, business or any other activities."
The affidavits of Coleman, John Morgan, Larry Hutter, and Pearl Frost, submitted in opposition to the motion for summary judgment, respectively read as follows:
Affidavit of Walter Lord Coleman:
"My name is Walter Lord Coleman. . . . I met Lucretia Stinson approximately seven years ago and we lived together in her home as husband and wife. Her daughter sometimes lived at the house with us.
"Shortly after I met Lucretia, at her insistence, I moved into her home on Crenshaw Street. She and I shared a lot in common, we enjoyed each other's company, and we were both lonesome for companionship. We had a yard sale at my house and sold most of my furniture and furnishings. Items that we could use were moved to her house.
"Lucretia and I opened up checking and savings accounts with both of our names on them. We deposited our funds into these accounts and both of us wrote checks on these accounts. She had other investments that she kept in her name alone or had her daughter's name on. She continued to use her name `L.E. Stinson.' She never wanted to go through the headache of having all of her documents, Social Security card, driver's license, etc., changed over into the name of Coleman. The fact that she chose to continue to use the name Stinson did not have an effect on our relationship.
"We spent much of our time with each other. Our relationship was exclusive to all others. After I moved in with Lucretia I never dated any other women nor she men. We enjoyed each other, we had a good relationship as friends and as lovers. We went everywhere together. We went to the grocery together, to the shopping malls together, out of town together in connection with my business, and vacationed together. We had discussed selling her house and buying a travel home and seeing the world. Our dreams were shattered by her sudden illness and death. When she became ill, I attended to her every need; I rarely left her once she was hospitalized.
"Our friends thought we were married. We enjoyed going out. We went to clubs and met other couples our age who had common interests. Generally, we were on a first name only basis with these couples, but they all thought we were married and we introduced each other to them as our respective spouse. I always referred to Lucretia as my wife and she referred to me as her husband. Our relatives knew that there had been no formal ceremony. Her sister urged her occasionally to have a ceremony. Shortly before her death she said she wanted to have a ceremony and we had our blood tests made. Unfortunately, the Probate Court requires that both parties come to the court house to apply for the license. Lucretia was confined to a wheel chair and far too weak to ever make the trip. Despite the fact that no ceremony was ever performed, we had long before made our vows to each other, pledging our love, our devotion, our dedication and fidelity.
"I enjoyed working around the house on Crenshaw Street. I painted, made repairs, kept the yard neat, and planted vegetable gardens. I oversaw the construction of the fence and other major home repairs. I did all the chores that a husband would do around his house. I also helped Lucretia with the cleaning and cooking. My hobby is fishing and Lucretia also enjoyed this with me. We would go to the Causeway, relax and appreciate being with each other.
"This has been an extremely traumatic experience for me. I am very bothered by my day to day living arrangement and my health has been affected by the emotional pressure. I had never given a deposition before and I was very nervous. After reading what I said my answers could easily be interpreted as meaning Lucretia and I did not have a marriage. I was trying to be honest. I knew that we had not had a traditional marriage ceremony and when I said we weren't married, I meant we were not married by a minister or judge. We were very much married in our own way. I was married twice in the traditional way, *Page 884 
had four children, and neither marriage gave me the pleasure and fulfillment that I shared with Lucretia. Lucretia had also been married twice, neither very happy. Marriage can be a wonderful experience with the right spouse and I am glad that Lucretia and I had the opportunity to discover how pleasurable it can be."
Affidavit of John Morgan:
"My name is John Morgan. . . . I have known Walter L. Coleman for approximately twenty years. I met Lucretia Stinson approximately five or six years ago. I met her prior to Walter introducing her to me in 1981.
"Shortly after Walter met Lucretia he moved into her home on Crenshaw Street. During the early stages of their relationship she insisted on his moving in with her. She told me that she conducted a yard sale at his house. I could plainly see that some of Walter's furniture and furnishings had been moved into her house.
"Walter and Lucretia spent all their time with one another. Their relationship was exclusive to all others. I never saw either of them with any other person of the opposite sex. They went everywhere together. They did the grocery shopping together, went to the shopping malls together, went out of town together in connection with Walter's business, and of course, vacationed together. When she became ill, Walter nursed her; he rarely left her side. He was totally dedicated to her.
"I assumed from their behavior that they were married. It was not my business to inquire into whether there had ever been a formal ceremony. Walter always referred to her as his wife and she referred to Walter as her husband. I heard this on numerous occasions. I remember one incident when we were at a fishing rodeo and a man came and sat down next to Lucretia. I heard her tell the man to move as he had sat down in her husband's chair. On other occasions when people would inquire of her about Walter she would always begin each sentence by saying, `my husband.'
"Walter was always working around the house on Crenshaw Street. He did the kind of things that you would expect a husband to do for his wife. He painted, made repairs, kept the yard clean, planted vegetable gardens, and in the end did much of the cooking and cleaning.
"I know nothing about their business arrangements. Everything I know is from my standpoint as a close friend."
Affidavit of Larry Hutter:
"My name is Larry Hutter. . . . I have known Walter L. Coleman for at least twenty years. Walter introduced me to Lucretia approximately four years ago.
"I saw Walter every four or five months, sometimes for business and sometimes socially. I visited him in Mobile at his home on Crenshaw Street.
"I assumed from their behavior that Walter and Lucretia had married. Walter always referred to her as his wife. On one occasion when I took them as my guests to a party I specifically remember hearing Walter introduce her to the other guests as his wife. I also remember that she referred to Walter as her husband.
"When I was around them they always referred to each other by their first names, dear or darling. I recollect that Lucretia told me that Walter was the best thing that had ever happened to her. They were an affectionate couple and had a great deal of affinity for one another.
"I know little about their business arrangements. Walter and I occasionally discussed investments but I never knew . . . whose names their investments were in. Everything I know is from my viewpoint as a friend."
Affidavit of Pearl Frost:
"My name is Pearl Frost. . . . I was hired to sit for Lucretia Stinson while she was in the hospital during the latter stages of her illness.
"In my opinion Walter Coleman was more than a husband to Lucretia Stinson. Mr. Coleman was always at the hospital. He only went home when he had to clean up or check on business matters. He actively cared for her by feeding her, putting her on the potty chair, attending to personal hygiene, and comforting her. He did the things I was hired to do because he wanted to. I have rarely seen someone so dedicated to another person. *Page 885 
"I never inquired as to their marital status. I assumed from their behavior that Walter and Lucretia were married, whether by commonlaw or by ceremony. I noticed that the checks did not have her name as Coleman, but that didn't indicate anything to the contrary to me. Walter referred to her as his wife; she referred to Walter as her husband.
"You could easily tell how much he meant to her. She loved him a great deal and wanted him with her as much as he wanted to be there. She did not want her daughter coming to Mobile and I heard her say that the only reason she would come would be for money.
"I know nothing about their business arrangements. Everything I know is from what I observed at the hospital."
The legal capacity of the deceased and Coleman to marry is not in question. Although some of the evidence contained in the affidavits and deposition testimony set out above is of questionable admissibility, there is admissible evidence that the deceased and Coleman agreed to enter into a marriage relationship. There is also admissible evidence of public recognition of the existence of the marriage, as well as admissible evidence of cohabitation and a mutual assumption openly of the marital duties and obligations. It is true, as the executrix contends, that many of the criteria indicative of the existence of a common-law marriage are not evidenced in this case; however, there is enough evidence to create a fact question as to whether Coleman was the common-law husband of the deceased. See, also, Downs v. Newman, 500 So.2d 1062 (Ala. 1986); Mattison v. Kirk, 497 So.2d 120 (Ala. 1986); and Boswellv. Boswell, 497 So.2d 479 (Ala. 1986).
Therefore, summary judgment for the executrix was not proper.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.
[1] The appellant lived with the deceased in her home.